**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MICHAEL D. THOMAS,** | |
| Plaintiff, | Case No. 1:13–cv–1087 (CRC) |
| v. | |
| **DISTRICT OF COLUMBIA,** | |
| Defendant. | |

## MEMORANDUM OPINION

Former District of Columbia Metropolitan Police Department ("MPD") officer Michael Thomas, while off duty and in another jurisdiction, shot an unarmed civilian who he believed had tried to burgle his truck.  Following an internal investigation and an administrative hearing, MPD terminated Thomas on the grounds that the shooting was unjustified and violated several MPD policies.  Thomas, who is African-American, responded by suing the District of Columbia for race discrimination.  He disputes the Department's factual findings regarding the incident and claims the MPD has disciplined non-African-American officers less severely for comparable infractions.  The District now moves for summary judgment.  Finding that Thomas has not offered *any* evidence to suggest that he was terminated because of his race, the Court will grant the District's motion and dismiss the case.

### I.       Background

#### A.   The September 13, 2009 Incident

The following facts are drawn from police reports of the incident that led to Thomas's termination and materials cited by the parties from subsequent MPD administrative proceedings. Thomas was off-duty in the early hours of September 13, 2009.  Def.'s Mot. Summ. J. ("MSJ")

Ex. B, 10.  While he watching television in bed at a residence in Hyattsville, Maryland, Thomas

heard his key fob sound an alarm, potentially indicating that someone was breaking into his

truck.  From the front window of the house, Thomas saw a stranger—later identified as Julio

Lemus—standing next to the truck.  Thomas grabbed his MPD-issued badge and gun and ran to

the front porch.  Id.  According to Thomas, he twice identified himself as a police officer and

asked Mr. Lemus to move on.  When Lemus refused, Thomas walked to within approximately

four feet of him.  Lemus then asked, "That's how you are going son?"  Id.  Thomas responded,

"Police, just leave," and shifted his belt so Lemus could see his badge and gun.  At that point

Thomas claimed Lemus began to approach him and reached into the pocket of his sweatshirt.

Purportedly fearing for his safety, Thomas drew his gun and shot Lemus twice.  Lemus survived.

There was no damage to Thomas's truck.

Lemus provided investigators a somewhat different account.  He testified that he had

been walking home from his cousin's nearby home, where the two had been drinking heavily.

Def.'s MSJ Ex. C, 6.  Lemus explained that he stopped next to Thomas's truck and attempted to

urinate, placing a bottle of beer on the truck in the process.  Id.  At this point, he heard something

from behind and turned to see Officer Thomas "charging" at him.  Id. at 6.  He raised his hands,

but Thomas continued to approach and pulled his gun.  Lemus insisted that Thomas never

identified himself as a police officer.  Yet as he turned to run away, Thomas shot him in the side

and leg.  Lemus denied ever walking toward Thomas or provoking him in any way. Lemus was

unarmed.

### B.  MPD's Investigation of the Incident

MPD conducted an internal investigation of the incident, which involved several levels of

administrative review.  First, the Force Investigations Branch of MPD's Internal Affairs Bureau

conducted a field investigation.  Detective James King was "assigned as the lead investigator and investigated the case under the direction of Lieutenant Guy Middleton of the Force Investigations Branch."  See Def.'s MSJ Ex. B, 11.  Detective King, in his initial report, found the shooting to be justified.  Id. at 23–24.  King wrote that "Officer Thomas reacted to what he perceived as a threat that could result in death or serious bodily injury and was in fear of his life when he discharged his [firearm]."  Id. at 23.  Lieutenant Middleton disagreed.  Middleton cited numerous flaws in King's report, including its failure to consider that Thomas had no law-enforcement authority in Maryland.  Id.  He added, moreover, that the shooting occurred following a series of questionable decisions by Thomas, such as failing to notify local police before confronting a person suspected of a non-violent property crime and not having less-than-lethal weapons at hand.  Id. at 5.  The Commanding Officer of the Force Investigations Branch reviewed both reports, ultimately recommending to the Use of Force Review Board that Thomas's actions were "Not Justified, Not Within Department Policy."  Id. at 3.  The Board concurred and accordingly referred the case to MPD's Disciplinary Review Branch for violations of MPD General Orders pertaining to the use of deadly force.  Def.'s MSJ Ex. B, 1.

Within the Disciplinary Review Branch, an Adverse Action Panel ("Panel") reviewed the case.  The Panel held a hearing at which Thomas, Lemus, and other witnesses testified, including Detective King.  Notably, King testified *against* Thomas and appeared to retract his earlier assessment that Thomas's use of force was justified.  According to the Panel findings, "Detective King . . . testified that he did not have all the information, in regard to this shooting that was available at the time he completed his report."  Def.'s MSJ Ex. C, 5.  King further claimed that "there were a lot of facts that he had not had an opportunity to review or to include in his report[,] and that the report was probably not complete to a percentage."  Id.  Finally, King

acknowledged that it is MPD policy for off-duty officers to "proceed cautiously, and . . . that it is prudent for off-duty MPD personnel to contact on-duty police officers from the jurisdiction that the incident occurred in prior to taking police action." Id. at 6.  The Panel ultimately found against Thomas on two charges: 1) "commission of any act which would constitute a crime," and 2) use of deadly force without necessary reason and not "to defend against an imminent attack posing the risk of serious bodily injury or death." Id.  The Panel recommended termination. Thomas appealed to the Chief of Police, who adopted the Panel's findings and terminated Thomas. Id.

C.  Procedural Background

Having exhausted his administrative remedies at MPD, Thomas filed suit in this Court against the District of Columbia on July 16, 2013.  He amended his complaint on September 26, 2013 and asserted four counts: Count One alleged employment discrimination on the basis of race under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11.  See First Amend. Compl. 1–2.  Count Two asserted a hostile work environment, also under Title VII and the DCHRA. Id.   Count Three sought recovery for constitutional violations under 42 U.S.C. § 1983. Id.  And Count Four sought equitable relief, including an order for the District of Columbia to institute an antidiscrimination policy and for MPD supervisors to undergo antidiscrimination training. Id. at 13–14.

Thomas consented to the dismissal of Counts Two and Four on October 1, 2014.  Thomas subsequently filed a Second Amended Complaint on October 14, 2014.  See Second Amend. Compl.  The District of Columbia then filed a motion to dismiss Thomas's § 1983 claim, arguing that a municipality cannot be liable under § 1983 absent "an official custom, practice, or policy

that caused the alleged constitutional violation." <u>See</u> Def.'s Mot. Dismiss Second Amend. Compl. 4–5.  The Court granted this motion on December 15, 2014, and the case proceeded to discovery.  The Court now considers the District of Columbia's motion for summary judgment on the remaining discrimination claim.

## II.     Legal Standard

The Court shall grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only when a reasonable fact-finder could find for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it is capable of affecting the outcome of litigation.  <u>Id.</u>  Non-material factual disputes are thus insufficient to prevent the Court from granting summary judgment.  <u>Id.</u>

In determining whether summary judgment is appropriate, the Court is obligated to review the "[u]nderlying facts and inferences … in the light most favorable to the non-moving party."  <u>Id.</u>  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact."  <u>Steele v. Carter</u>, 2016 WL 3620722, at *4 (D.D.C. June 29, 2016) (quoting <u>Celotex Corp. v. Caltrett</u>, 477 U.S. 317, 322–23 (1986)).  Once the moving party has demonstrated that a material fact cannot be disputed, the party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 250.

The non-moving party may oppose summary judgment using "any of the kinds of evidentiary materials listed in Rule 56(c)."  <u>Celotex Corp.</u>, 477 U.S. at 324.  This evidence includes materials found in the record, such as "depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions interrogatory answers or

other materials." Fed. R. Civ. P. 56(c)(1). To defeat a motion for summary judgment in a Title

VII action, the non-moving party's evidence may show "the employer's better treatment of

similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest

explanations, its deviation from established procedures or criteria, [ ] the employer's pattern of

poor treatment of other employees in the same protected group as the plaintiff, or other relevant

evidence that a jury could reasonably conclude evinces an illicit motive." Wheeler v.

Georgetown Univ. Hosp., 812 F.3d 1109, 115 (D.C. Cir. 2016).

This evidence must allow "the factfinder … [to] *believe* the plaintiff's explanation of

intentional discrimination." Id. at 147 (emphasis in original). In other words, to survive

summary judgment in a Title VII action, a plaintiff "must show *both* that the reason [for

termination] was false, *and* that discrimination was the real reason." Aka v. Washington Hosp.

Center, 156 F.3d 1284, 1290 n.4 (D.C. Cir. 1998) (emphasis in original). "The evidence offered

is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S.

at 255. "Mere unsupported allegations or denials," alone, are insufficient to defeat summary

judgment. Celotex Corp., 477 U.S. at 324. Summary judgment, therefore, is appropriate when

the non-moving party fails to provide "evidence on which the jury could reasonably find for the

[non-movant]." Anderson, 477 U.S. at 252.

## III.    Analysis

Title VII of the Civil Rights of 1964 makes it unlawful for an employer to "refuse to hire

or to discharge any individual, or otherwise to discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's

race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. The District of Columbia

Human Rights Act uses almost precisely the same language.  See D.C. Code § 2–1402.11.  When presented with a suit alleging violations of each law, courts generally evaluate the claims under Title VII jurisprudence.  See Carpenter v. Fed. Nat'l Mortg. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (applying the same test for violations of the Human Rights Act as would apply to violations of Title VII due to the "substantial similarity" between the two laws).  The Court will therefore evaluate Thomas's claims under both statutes simultaneously.

A plaintiff can defeat a summary judgment motion with either direct evidence or circumstantial evidence of unlawful discrimination.  Dunaway v. Int'l Bd. Of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002).  The Court must first determine if the former exists, as direct evidence, alone, "generally entitle[s] a plaintiff to a jury trial."  Vatel v. Alliance of Auto. Mfrs., 627 F.3d 1245, 1247 (D.C. Cir. 2011).  Direct evidence may include, for example, "a statement that itself shows a racial or gender bias in the [adverse employment] decision."  Id.  Thomas does not cite to any direct evidence of a Title VII violation.  His claim relies instead on purportedly circumstantial evidence of discrimination: that MPD has not terminated white officers who engaged in similar or more egregious conduct.

If a plaintiff relies on circumstantial evidence to support a Title VII claim, the Court ordinarily turns to the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973); Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999).  Under this framework, the plaintiff must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802–05.  If the plaintiff sets forth a prima facie case, the defendant then has the burden "to articulate some legitimate, nondiscriminatory reason" for the adverse employment decision.  McDonnell Douglas, 411 U.S. at 802–05.  If the employer does so—as the District has here—"the district court must resolve one central question: Has the

employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of race, color, religion, sex, or national origin?"

Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008).  The Court considers

this question "in light of the total circumstances of the case."  Hamilton v. Geithner, 666 F.3d

1344, 1351 (D.C. Cir. 2012).  MPD has offered a facially non-discriminatory reason for

Thomas's termination: that he used unjustified deadly force against Mr. Lemus and violated

MPD policies regarding the use of force and police action while off duty and outside the

jurisdiction.  The Court therefore turns to Thomas's evidence that the District of Columbia's

reason was pretext for discrimination.

Thomas's purported evidence is two-fold:  First, he cites other non-black officers who he

claims received lesser discipline for similar offenses.  See Pl.'s Opp'n Def.'s MSJ ("Pl.'s

Opp'n") 4–5.  Second, he claims that MPD erroneously found his use of force to be

unreasonable.  Id. (asserting that the reasonableness of Thomas's shooting is a disputed material

fact that entitles him to a jury trial).  The Court begins with the former.  To be similarly situated

under Title VII, the plaintiff must demonstrate that "all of the relevant aspects" of plaintiff's

employment situation were "nearly identical" to those of the comparable employee.  Neuren v.

Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995).  Moreover, "the

allegedly similarly situated . . .  employee [must have been] charged with offenses of comparable

seriousness."  Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999) (internal quotations

omitted).

Thomas identifies four non-black officers who he claims were treated more favorably

than he was.  See Pl.'s Opp'n 4–5.  The first is Curt Bonney, a white officer who, like Thomas,

used deadly force against a civilian.  See id. at 4; Buruca v. District of Columbia, 902 F. Supp.

2d 75, 78 (D.D.C. 2012) (granting defendant's summary judgment motion in the wrongful death

action that followed Officer Bonney's use of deadly force).  In the purportedly comparable

incident, Officer Bonney responded to a 911 call reporting gunshots near a gas station.  See

Buruca, 902 F. Supp. 2d at 78.  When Bonney arrived at the scene, he ordered the gunman to

drop his weapon.  The gunman refused and pointed his gun at the officer.  Bonney then shot him.

Id. at 78–79.  The incident involving Bonney is not comparable to that here.  Unlike Thomas,

Bonney was on duty and within the District of Columbia.  Bonney shot an armed suspect under

circumstances that a court ruled justified the use of deadly force.  On these facts, Officer Bonney

is clearly not a similarly situated employee for the purposes of a Title VII action.

Thomas's second comparator is a white officer, "J.T."[1]  See Pl.'s Opp'n 4–5.  MPD

conducted an internal investigation of J.T. following allegations that he sexually assaulted a

cooperating witness in a drug investigation.  According to an MPD internal investigation report,

J.T. categorically denied engaging in any type of sexual contact with the cooperating witness,

and investigators ultimately found a lack of evidence to support the witness's allegations.  The

MPD investigation thus concluded with a recommendation that the case be closed.  Prosecutors,

moreover, declined to bring charges against J.T., citing the cooperating witness's unwillingness

to fully cooperate with the investigation and the lack of an independent corroborating witness.

Id. at 24.  Investigators did find that J.T. violated MPD general orders by using his personal

---

[1] The Court will use the initials of the latter three officers because the information concerning their infractions is found in their confidential personnel files.  The parties filed these confidential personnel files with the Court under seal.  Information concerning the incident involving Officer Bonney is publically available in the wrongful death lawsuit that the victim's family brought against the District of Columbia.  See Buruca v. District of Columbia, 902 F.2d 75 (D.D.C. 2012).

vehicle to carry out his official duties without authorization.  Id. at 25.  On these facts, the Court

finds that J.T. is not a similarly-situated employee.  The most important distinction is that J.T.,

unlike Thomas, was not found to have committed a serious offense.  And the offense under

investigation, while serious, did not involve the use of deadly force.  Accordingly, MPD's

handling of J.T.'s case is not at all probative of its treatment of Thomas.

The third officer to whom Thomas seeks to draw a comparison is "M.R.," a Hispanic

male.  According to MPD records, M.R. entered the home of a male acquaintance who was in the

midst of a divorce.  See Pl.'s Opp'n Ex. 17.  Drunk and belligerent, M.R. physically pushed

either the acquaintance or his wife to the floor.[2]  Regardless, prosecutors declined to bring

charges against M.R.  And while MPD initially disciplined M.R. by placing him on "Non-contact

status," it subsequently found that "the investigation has not revealed facts which support a

requirement that [M.R.] should continue in a Non-contact status."  Id.  The Court finds that M.R.

is not similarly situated to Thomas.  The two cases are different because the potential offenses

that M.R. committed—burglary and battery—are much less serious than Thomas's use of deadly

force against Mr. Lemus.  M.R. got drunk and pushed someone to the ground.  Thomas shot an

unarmed citizen twice.  Since M.R. was not "charged with [an] offense[ ] of comparable

seriousness," his treatment by MPD is not evidence of discrimination against Thomas.

Holbrook, 196 F.3d at 261.

Finally, Thomas points to a Hispanic officer, "F.L.," who purportedly was similarly

situated and received less discipline.  See Pl.'s Opp'n 5.  In his Opposition to the District of

Columbia's Motion for Summary Judgment, Thomas cites to an Exhibit 16 to support this claim.

---

[2] The initial incident report states that M.R. committed the battery against the husband, whereas a subsequent memorandum to the MPD's Internal Affairs Bureau states that the wife was the victim.  See Pl.'s Opp'n Ex. 17.

Thomas, however, has filed no such exhibit with the Court.  And "to defeat a motion for

summary judgment, the non-moving party must offer more than mere unsupported allegations or

denials."  Celotex, 477 U.S. at 324.  But even if the Court were to accept Thomas's unsupported

assertions about F.L. as true, they do not constitute evidence of discrimination.  According to

Thomas:

> Plaintiff's co-worker, a Hispanic, F.L. was off duty and out of his
> jurisdiction in Pennsylvania, when he became disruptive and was
> asked to leave an establishment.  He re-approached the
> establishment with his weapon in hand and refused to drop the
> weapon when ordered to do so by Detectives of the Pennsylvania
> Police Department.  F.L. was eventually taken to the ground and
> placed under arrest.  The MPD determined that the Charges against
> F.L. should be sustained, and the Department was advised of the
> date by which discipline could be timely brought.

Pl.'s Opp'n 5.  Thomas does not say what level of discipline F.L. received.  Id.  Nevertheless,

F.L.'s purportedly disruptive behavior and his refusal to drop a weapon are not as serious as

Thomas's use of deadly force against an unarmed civilian.  As a result, the Court finds that F.L.

was not "charged with [an] offense[] of comparable seriousness."  Holbrook, 196 F.3d at 261.

Any discrepancy in MPD's treatment of Thomas and F.L. is therefore not evidence of

discrimination against Thomas.[3]

---

[3] Thomas has also filed with the Court a selection of MPD disciplinary records that document a broad range of infractions from 2009 to 2013.  See Pl.'s Opp'n Exs. 26–32  These records list the offense committed, the race of the officer involved, and the punishment handed down.  Without reference to any single infraction listed among the exhibits, Thomas claims the exhibits show that "White [o]fficers who have been involved in conduct the same or similar or more egregious than Mr. Thomas have not been terminated because they are White."  Pl.'s Opp'n 4 (citing Pl.'s Opp'n Exs. 26–32).  The records provided, however, support no such conclusion.  Among the deficiencies is that none of the infractions listed in the selected records is as serious as the use of deadly force against a civilian.  See Pl.'s Opp'n Exs. 26–32.

Moving from comparator officers, Thomas also claims that MPD's rationale for his termination is pretextual because his shooting of Lemus was justified.  See Pl.'s Opp'n 16–17 (arguing that the rationale MPD relied on in its decision to terminate Thomas "is unsupported by the evidence"); id. at 4-6 (including the details of the shooting among a list of "material facts to which there exists genuine issues in dispute").  To be sure, the underlying facts of the shooting remain disputed.  But these disputed facts are not material to this lawsuit.  Even if the Court were to find that Thomas's use of force was justified, "it may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  Fischbach v. D.C. Dep't of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotations omitted).  Title VII, after all, "does not authorize a Federal court to become a super-personnel department that reexamines an entity's business decisions."  Downing v. Tapella, 729 F. Supp. 2d 88, 93–94 (D.C. Cir. 2010) (internal quotations omitted).  Thomas will prevail here only if he proves MPD fired him *because of his race*.

Accordingly, the Court need not wade too far into the merits of whether Thomas's use of deadly force against an unarmed civilian was justifiable under MPD policy.  It suffices to note that the MPD considered the evidence and found against Thomas at several levels of review.  Even Detective King, whose favorable initial report Thomas identifies as evidence of pretext, effectively retracted his report and testified against Thomas.  See Def.'s MSJ Ex. C, 3–5.  Nothing in the record suggests that the decision to terminate Thomas was tainted by discrimination.  The Court therefore finds that the factual disputes concerning the initial shooting are not material, and do not entitle Thomas to a jury trial.

IV.     **Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment, and enter Judgment in favor of the District of Columbia on Thomas's remaining

claims under Title VII and the District of Columbia Human Rights Act.  An Order accompanies

this Memorandum Opinion.


Date:   September 16, 2016                                   _____
                                                            CHRISTOPHER R. COOPER
                                                            United States District Judge